United States District Court
For the Northern District of California

1

2

3

4              UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9

10   UNITED STATES OF AMERICA,

11          Plaintiff,                          No. C 09-0437 PJH

12      v.                                      **ORDER RE CROSS-MOTIONS FOR
                                                SUMMARY JUDGMENT**
13   CALIFORNIA DEPARTMENT OF
     TRANSPORTATION,
14
            Defendant.
15   _____/

16          The parties' cross-motions for summary judgment came on for hearing before this

17   court on February 2, 2011.  Plaintiff United States of America appeared by its counsel

18   Bradley R. O'Brien and Davis H. Forsythe, and defendant California Department of

19   Transportation ("CalTrans") appeared by its counsel Derek S. Van Hoften and Janet Wong.

20   Having read the parties' papers and carefully considered their arguments and the relevant

21   legal authority, and good cause appearing, the court hereby GRANTS the United States'

22   motion, with one limited exception, and GRANTS CalTrans' motion in part and DENIES it in

23   part.

24                              **BACKGROUND**

25          In this action, the United States seeks to hold CalTrans liable for damage caused by

26   contaminants that have entered Mountain Lake, part of the Presidio of San Francisco ("the

27   Presidio"), in runoff flowing through storm drains from Park Presidio Boulevard, which is

28   operated and maintained by CalTrans.  The United States also asserts that CalTrans is

United States District Court

For the Northern District of California

1  liable for repairs to a degraded pipeline system that carries overflow water from Mountain

2  Lake to San Francisco's sewer system.

3       The Presidio, which is located in the northwest corner of the San Francisco

4  peninsula, was formerly one of the oldest continuously operated military posts in the United

5  States.  Established by Spain in 1776 as a military garrison (El Presidio Real de San

6  Francisco), it passed into the control of the Republic of Mexico after Mexico declared its

7  independence from Spain in 1821.  The United States occupied the Presidio in 1846 at the

8  beginning of the Mexican-American War.  In 1848, at the conclusion of the war, the Treaty

9  of Guadalupe Hidalgo provided for the cession of much of Mexico's pre-war territory,

10 including present-day California, to the United States.  California was admitted to the Union

11 as a state on September 9, 1850.

12       For more than 140 years, the Presidio was maintained by the United States Army as

13 a functional installation known as the Presidio of San Francisco Military Reservation.  For

14 approximately the first two-thirds of that period, the United States Army came under the

15 jurisdiction of the United States Department of War.  The Secretary of War led the War

16 Department, and was a member of the United States President's Cabinet, beginning with

17 George Washington's administration.  In 1798, the Secretary of the Navy was added to the

18 Cabinet, and the scope of the office of Secretary of War was reduced to a general concern

19 with the Army.

20       In 1938, the Secretary of War issued a permit ("1938 Permit" or "the Agreement") to

21 the State of California, granting a right of way "for the extension, maintenance and

22 operation of a state road (known as the Funston Avenue approach) on the Presidio of San

23 Francisco Military Reservation."  The 1938 Permit was issued pursuant to an Act of

24 Congress approved July 5, 1884.[1]

25 _____

26      [1] The July 5, 1884 Act of Congress provided in part, as follows:

27   The Secretary of War shall have authority, in his discretion, to permit the
     extension of State, county and Territorial roads across military reservations; to
28   permit the landing of ferries, the erection of bridges thereon; . . . whenever in his
     judgment the same can be done without injury to the reservation or

United States District Court

For the Northern District of California

This road (the Funston Avenue approach) is an extension of what is now Park Presidio Boulevard, part of Route 1, a California Highway.  The road was constructed in order to connect Route 1 with the Golden Gate Bridge, which had been opened to traffic in May 1937.  The 1938 Permit describes the road generally as traveling northward from the southern portion of the Presidio, and "connecting with the existing Marina approach to the Golden Gate Bridge, constructed under a permit granted by the Secretary of War to the Golden Gate Bridge and Highway District on February 13, 1931."  1938 Permit, at 1.

The 1938 Permit designated the Commanding General of the U.S. Army Ninth Corps Area[2] as the authorized representative of the Secretary of War "in all matters pertaining" to the Permit, and provided that all discretion and authority for the United States under the Permit was vested in the Secretary of War or said Commanding General as authorized representative.  Id., ¶ 21.

The 1938 Permit did not require the State of California to make any payment in exchange for the permitted use.  Instead, it included numerous "provisions and conditions," including provisions protecting the United States from any resultant expenses, and requiring the State to bear all costs and liabilities associated with the highway.

The provisions and conditions of the 1938 Permit that are relevant to the present litigation are set forth in ¶¶ 9, 12, 15, 18, 20, and 21, which read as follows:

[T]he road herein authorized shall be constructed, operated, and maintained without expense to the War Department.

Id., ¶ 9.

[A]ny and all construction under this permit affecting the reservation of the United States and the coast defenses of San Francisco shall be subject to the direction of the Secretary of War, or his authorized representative.  If, in the opinion of the Secretary of War, or his authorized representative, any construction authorized hereunder shall now or hereafter tend to affect or

inconvenience to the military forces stationed thereon . . . .

Act of July 5, 1884, 23 Stat. 104, ch. 214, § 6, codified at 10 U.S.C. § 1348 (repealed 1956).

[2]  The old "Corps Areas" were subsequently eliminated as the result of reorganization after World War II, and were replaced by six field army-level organizations.  The former Ninth Corps Area was designated the Sixth Army Area.

United States District Court
For the Northern District of California

impair the use of land or other property of the United States for national defense or other public purpose, the permittee shall, without expense to the War Department, make any change or changes in the topography of the land and any alteration, relocation, reconstruction or replacement of any existing post roads, buildings, walls, pipe lines, aerial or underground power or communication lines, or any other post utility, installation, facility or structure of whatever kind, that may to any degree be interfered with incident to the construction, operation and maintenance of said approach road, and the Secretary of War, or his authorized representative shall be the sole judge as to the character and extent of such work that may be necessary. The permittee shall prepare and submit to the authorized representative of the Secretary of War for his approval, plans showing in detail the work which the Secretary of War, or his authorized representative, requires to be performed. All such work shall be performed by the permittee without expense to the War Department in accordance with the plans approved, and to the satisfaction of said authorized representative. And generally any damage caused to property of the United States incident to the construction, operation or maintenance of said road shall be promptly repaired by the permittee at its expense to the satisfaction of the said authorized representative.

Id., ¶ 12.

[W]ithout excluding other rights that the United States may have as owner of the servient estate, the United States hereby specifically reserves the right to make such connections between the road herein authorized and other roads on the reservation as the Secretary of War, or his authorized representative, may at any time consider necessary. The expense of such connection will be borne by the permittee. The United States also, without excluding other rights, specifically reserves the right to construct in, on, along or across the road herein authorized electric transmission, telephone and telegraph lines, either overhead or underground, and to lay in, along or across said road water, gas, oil, gasoline and sewer pipe lines. It is also understood and agreed that the permittee will construct such culverts or other drainage facilities, as, in the opinion of the Secretary of War, or his authorized representative, shall be or become necessary to the proper use of the reservation by reason of the construction of said road.

Id., ¶ 15.

[T]he United States shall not be responsible for damages to property or injuries to persons upon said road, or for damages to persons or property which may arise incident to the construction, maintenance or operation of said road, and the permittee shall save the United States harmless from any claims for such damages.

Id., ¶ 18.

[I]n the event of failure, neglect or refusal of the permittee to perform or to complete any of the work on its part to be performed under the provisions and conditions of this permit, the Secretary of War or his authorized representative may cause the same to be done at the expense of the permittee.

Id., ¶ 20.

[T]he Commanding General, Ninth Corps Area, shall be the authorized representative of the Secretary of War in all matters pertaining to this permit; . . . his directions concerning matters in the permit shall be strictly and promptly carried out by the permittee, and . . . his decision in all matters relating to the permit shall, unless otherwise provided herein, be final.  The said representative of the Secretary of War is authorized to approve modifications of plans and details of plans found necessary in the progress of construction of said road.

Id., ¶ 21.

The State of California Department of Public Works, Division of Highways, constructed Park Presidio Boulevard pursuant to the 1938 Permit.  At the southern edge of the Presidio, the highway runs directly to the west of Mountain Lake, which is one of the few natural lakes in San Francisco (and the only lake within the Presidio).  Mountain Lake is a popular visitor destination, with a variety of natural, cultural, and recreational resources, including a playground, walking path and trail, and a small beach, and attracts migratory birds and resident wildlife.

Pursuant to the 1938 Permit, the State installed several storm drains running from Park Presidio Boulevard directly into Mountain Lake.  Those storm drains direct runoff from the highway into Mountain Lake.  As a result, substances contained in highway runoff, including lead, copper, and zinc, are carried through the storm drains and into the lake.

As part of the process of constructing the road, the State added fill material to Mountain Lake, decreasing the lake's holding capacity.  Thus, also pursuant to the 1938 Permit, the State installed an overflow pipeline in the southwest corner of the lake, designed to channel excess water westward out of the lake (so that water levels in the lake would not rise and threaten the integrity of the highway).  As initially designed, the overflow pipeline discharged directly into Lobos Creek, then the primary source of drinking water in the Presidio.

In 1941, after receiving complaints from the U.S. Army that Mountain Lake overflow was contaminating Lobos Creek, the State agreed to modify the overflow pipeline, to extend it 2000 feet, to a point of discharge into the City of San Francisco sewer system.  At that time, the State recognized that pursuant to ¶ 12 of the 1938 Permit, it was obligated to

United States District Court

For the Northern District of California

1  comply with the Army's demand.  The overflow pipeline is now approximately 70 years old.

2  Portions of the pipeline are cracked and degraded, and may be in need of repair or

3  replacement.

4       The National Security Act of July 26, 1947, Pub. L. No. 80-253, 61 Stat. 495,

5  effected a reorganization of the military departments.  Pursuant to Title II of the National

6  Security Act, the United States created the "National Military Establishment," to be headed

7  by the Secretary of Defense,[3] and consisting of the Department of the Army, the

8  Department of the Navy, and the Department of the Air Force.

9       Section 205(a) of the National Security Act provided that "[t]he Department of War

10  shall hereinafter be designated the Department of the Army, and the title of Secretary of

11  War shall be changed to Secretary of the Army," who became the Secretary of Defense as

12  of September 18, 1947.

13       In addition, § 205(b) of the National Security Act provided that

14  [a]ll laws, orders, regulations, and other actions relating to the Department of
War or to any officer or activity whose title is changed under this section shall,

15  insofar as they are not inconsistent with the provisions of this Act, be deemed
to relate to the Department of the Army within the National Military

16  Establishment or to such officer or activity designated by his or its new title.

17  Section 305(a) of the National Security Act provided, with regard to "any function, activity,

18  personnel, property, records, or other thing transferred under this Act," that

19  after any such transfer, any . . . law, order, regulation or other action which
vested functions in or otherwise related to any officer, department, or agency

20  from which such transfer was made shall, insofar as applicable . . . and to the
extent not inconsistent with other provisions of this Act, be deemed to have

21  vested such function in or relate to the officer, department, or agency to which
the transfer was made.

22

23  Section 308(a) of the Act defined "function" as including "functions, powers, and duties."

     Since 1949, the Secretaries of the Army, Navy, and Air Force have held non-

24  Cabinet positions under the Secretary of Defense.  In accordance with 10 U.S.C. § 3013,

25  the Secretary of the Army is responsible for all matters relating to the Department of the

26

27      [3] In 1949, amendments to 1947 Act converted the "National Military Establishment" into

28  the "Department of Defense."  National Security Act Amendments of 1949, Pub. L. No. 81-216,
63 Stat. 578.

United States District Court

For the Northern District of California

1    Army.

2        In 1972, Congress passed legislation that resulted in the creation of the Golden Gate

3    National Recreation Area ("GGNRA").  See Act of October 27,1972, Pub. L. No. 92-589, 86

4    Stat. 1299.  The legislation creating the GGNRA required the Secretary of the Army to

5    grant to the Secretary of the Interior an irrevocable use and occupancy for certain portions

6    of the Presidio.  The legislation further required that "when all or any substantial portion of

7    the remainder of the Presidio is determined by the Department of Defense to be excess to

8    its needs, such lands shall be transferred to the jurisdiction of the Secretary [of the Interior]

9    for the purposes of this [Act]."  Id.; see 16 U.S.C. § 460bb-2(d)-(f).

10       In 1989, in response to efforts by Congress to downsize the military and to help

11   reduce the budget deficit, the Secretary of Defense's Commission on Base Realignment

12   and Closure recommended the closing of eighty-six military bases, including the

13   Presidio.  Accordingly, pursuant to the Defense Authorization Amendments and Base

14   Closure and Reallignment Act of 1988, Title II, Pub. L. No. 100-526, Oct. 24, 1988, 10

15   U.S.C. § 2687, the Army closed its base at the Presidio.

16       In September 1990, the Department of the Army and the Department of the Interior

17   entered into an Interagency Agreement regarding the transfer of the Presidio.  Under

18   Subagreement 7 to the Interagency Agreement, and consistent with Executive Order No.

19   12580 (which vests the Department of Defense with cleanup authority under the National

20   Contingent Plan), the Army retained lead agency status for the environmental cleanup of

21   the Presidio, and remained responsible for remediating contamination for which it was

22   responsible, and for pursuing other parties that had caused contamination at the Presidio.

23       Subagreement 7 specifically covers "all areas of the Presidio permitted to the

24   Golden Gate Bridge Highway and Transportation District and to the California Department

25   of Transportation."  Thus, under Subagreement 7, the Army retained enforcement authority

26   with respect to any environmental claims arising out of the 1938 Agreement after the

27   transfer of the Presidio to the National Park Service.

28       On September 30, 1994, the Army transferred to the Department of the Interior "all

7

United States District Court
For the Northern District of California

1   jurisdiction and control of the real property, interests, rights, leases, easements, and

2   appurtenances at the Presidio of San Francisco" for incorporation into the GGNRA.  As of

3   October 1, 1994, the National Park Service (part of the Department of the Interior) officially

4   assumed responsibility for management of the Presidio.

5          In 1996, in enacting the Presidio Trust Act, Congress created the Presidio Trust, a

6   wholly-owned government corporation.  See 16 U.S.C. § 460bb.[4]  The Presidio Trust Act

7   calls for the "preservation of the cultural and historical integrity of the Presidio for public

8   use," and requires that the Trust be financially self-sufficient by 2013.

9          Pursuant to § 103(c) of the Presidio Trust Act, as amended, the Presidio Trust is

10   governed by a seven-member Board of Directors.  The Trust is authorized to appoint an

11   Executive Director "and such other officers and employees as it deems necessary."  The

12   Executive Director is the chief executive officer of the Trust, with the general powers and

13   duties usually vested in the offices of president and secretary of the corporation.

14          The Executive Director oversees a staff with expertise in resource preservation,

15   operations and maintenance, planning, real estate development, public affairs and

16   programs, law, and finance.  Key members of the staff comprise the executive

17   management team.  One of these key members, the General Counsel of the Presidio Trust,

18   is the "authorized representative" for the Trust for all legal matters.

19          On July 1, 1998, the Department of the Interior transferred administrative jurisdiction

20   over the interior 80% of the Presidio's lands ("Area B") to the Presidio Trust.  The National

21   Park Service retained jurisdiction over the coastal 20% ("Area A").[5]  Thus, the Trust is the

22   successor-in-interest to the Army and the National Park Service with respect to Area B.

23   Mountain Lake and the portion of Park Presidio Boulevard located inside the Presidio are

24

25          [4] The original version of the Act was enacted as part of the Omnibus Parks and Public

26   Lands Management Act of 1996, Title I of H.R. 4236, Pub. L. No. 104-333, 110 Stat. 4093,
     4097-4104 (Nov. 12, 1996).

27          [5] For a more complete discussion of the transfers that led to the creation of the Presidio

28   Trust and its authority over the Presidio, and the process itself, see Donald J. Hellman, The
     Path of the Presidio Trust Legislation, 28 Golden Gate U. L. Rev. (1998).

United States District Court

For the Northern District of California

1    both within Area B.

2    Prior to the creation of the Trust, the Army investigated the Presidio's environmental

3    conditions, prepared a series of reports, and conducted limited cleanup actions.  After the

4    transfer of the Presidio to the National Park Service, and later to the Trust, the Trust

5    assumed the Army's cleanup obligations within both Area B (under the Trust's jurisdiction)

6    and Area A (under the jurisdiction of the National Park Service).

7    The Trust's cleanup responsibility is set forth in two 1999 agreements.  Pursuant to

8    one of these, the May 24, 1999, "Memorandum of Agreement Regarding Environmental

9    Remediation at the Presidio of San Francisco" ("MOA"), signed by the Army, the Presidio

10   Trust, and the National Park Service, the Trust assumed the Army's responsibility as the

11   lead cleanup agency for the entire Presidio (although under certain enumerated

12   circumstances, the Army remained responsible for funding and performance of certain

13   activities of remediation of contamination).  Also on May 24, 1999, the Presidio Trust and

14   the National Park Service entered into a separate "Memorandum of Agreement For

15   Environmental Remediation of the Presidio of San Francisco Area A Property," concerning

16   actions necessary to address remediation in Area A of the Presidio.

17   The MOA provided, in § 9.3, that "in addition to the Army's responsibilities for

18   Unknown Contamination at the Presidio," certain listed sites "and any Substances and

19   Conditions associated with those sites, shall be treated as Unknown Contamination under

20   this Agreement, to the extent that such Substances and Conditions are not otherwise

21   remediated in accordance with Applicable Law by any entity that is not a party to this

22   Agreement."  The MOA defined "Unknown Contamination," in part, as "any Substance or

23   Condition at the Presidio that existed prior to 1994."  One of the sites listed in § 9.3 is

24   "CalTrans Area," defined as "All Substances and Conditions associated with the California

25   Department of Transportation right-of-way through the Presidio."

26   On August 30, 1999, the Presidio Trust, the National Park Service, and the

27   California Department of Toxic Substances Control ("DTSC" – the State agency with

28   oversight over environmental cleanup) entered into a Consent Agreement, which generally

9

United States District Court

For the Northern District of California

1   requires the Presidio Trust to perform remedial investigation and remedial action at certain

2   locations in the Presidio, including Mountain Lake.  Accordingly, the United States

3   proceeded to conduct a preliminary investigation and the planning steps required under the

4   1999 Consent Agreement.

5         In 2000, DTSC directed the Presidio Trust to evaluate the presence of lead in the

6   sediment in Mountain Lake.  In January 2001, the Trust's contractor conducted a sediment

7   investigation, and detected concentrations of lead, copper, zinc, pesticides, and

8   hydrocarbons.  In a letter dated September 28, 2001, DTSC notified CalTrans that it had

9   determined that contaminants within the Mountain Lake sediment "represent a hazard to

10  human health and the environment."  DTSC's letter directed CalTrans (as well as the

11  Presidio Trust and the Army) to investigate and remediate the contamination.  DTSC sent a

12  second, similar letter to CalTrans in February 2002.

13        The Presidio Trust's contractor conducted further studies, and the Trust prepared a

14  revised Feasibility Study for a number of sites, including the Mountain Lake site.  The

15  Trust's General Counsel was briefed by her staff on the results of the Mountain Lake

16  sediment investigations.  As a result, she determined that discharges of lead, copper, and

17  zinc from Park Presidio Boulevard had damaged and impaired Mountain Lake, and that

18  dredging would likely be necessary to remedy the damage.  The General Counsel also

19  determined, after further briefing by staff, that the overflow pipeline was cracked, degraded,

20  and in need of repair or replacement.

21        In a September 6, 2006 letter, the Presidio Trust made a formal claim against the

22  Army for Unknown Contamination at Mountain Lake, pursuant to the MOA, based on the

23  evidence that CalTrans' highway was the primary source of lead, copper, and zinc

24  contamination in Mountain Lake sediments.  The Presidio Trust demanded that the Army

25  conduct, and/or pay the cost of conducting all work necessary to remediate the

26  contamination of Mountain Lake sediment caused by the State's construction, operation,

27  and maintenance of Park Presidio Boulevard.

28        Pursuant to General Order No. 3 (July 9, 2002), the Secretary of the Army has

United States District Court
For the Northern District of California

delegated all matters relating to installations, real estate, the environment, safety, and occupational health to the Assistant Secretary of the Army (Installations and Environment). The Army's "military environmental programs," for which the Assistant Secretary of the Army (Installations and Environment) has primary responsibility, are in turn to be carried out by the Deputy Assistant Secretary of the Army (Environment, Safety, and Occupational Health) ("DASA(ESOH)").  Army Reg. 200-1 (rev. 2007), at § 1-5.  The DASA(ESOH) is the "primary point of contact with . . . Federal and State Agencies . . . for environmental matters."  Id.

In April 2007, the DASA(ESOH) determined that discharges of lead, copper, and zinc from Park Presidio Boulevard had damaged Mountain Lake and were tending to "impair its use for public purposes" within the meaning of the 1938 Permit.  In an April 19, 2007 letter, the Army notified CalTrans that the construction, operation, and maintenance of Park Presidio Boulevard had damaged Mountain Lake by contaminating its sediments with lead, copper, and zinc, for which contamination CalTrans was responsible.  The letter cited ¶¶ 9, 12, 15, 18, and 20 of the 1938 Permit as bases for CalTrans' liability, and demanded that pursuant to ¶ 18, CalTrans indemnify the United States for all past and future costs arising from the Presidio Trust's claim against the Army.

In March 2008, on the basis of prior determinations and with the approval of the Presidio Trust's Executive Director, the Trust's General Counsel requested that the United States Department of Justice pursue claims against CalTrans under the 1938 Permit. On April 18, 2008, the Trust joined the Army in issuing a letter to CalTrans, demanding that CalTrans comply with the terms of the 1938 Permit, remediate Mountain Lake, take measures to ensure that Mountain Lake was not further contaminated, and otherwise ensure that the Army would not be put to expense as a result of the construction, operation, and maintenance of CalTrans' highway.

The April 18, 2008 letter explained that "[a]s of this date, the State of California has failed to comply with the previous request from the authorized representative of the Secretary of Defense that it remedy or pay for remediation of the damage caused to

Mountain Lake . . . take measures necessary to avoid further damage to Mountain Lake, and indemnify the Army for [the Presidio Trust's claims against it]."  The letter noted further that

> the State's construction, operation and maintenance of an overflow pipeline system for Mountain Lake (activity undertaken pursuant to the 1938 Agreement) has negatively impacted water quality in Lobos Creek. . . . [P]ursuant to paragraph 15 of the 1938 Agreement, the State of California agreed to construct such culverts and drainage facilities as should become necessary. . . . The Army and the Presidio Trust believe that construction of such drainage facilities is necessary to prevent further damage to Lobos Creek.

On January 30, 2009, the United States filed the present action against CalTrans, seeking to recover for damage to Mountain Lake and Lobos Creek.  The United States asserts that CalTrans is liable for damage caused by contaminants (lead, copper, zinc, petroleum hydrocarbons) flowing into Mountain Lake from storm drains built by the State of California as part of the construction of Park Presidio Boulevard.  The United States also alleges that CalTrans is liable for necessary repairs to the overflow pipeline, because the cracked pipe is allowing contaminated water to flow into Lobos Creek, a major source of water for the Presidio.

In the complaint, the United States alleges five causes of action, each of which alleges a "material breach of the 1938 Agreement."  In the first cause of action, the United States alleges violation of ¶ 12 of the Agreement, based on the contamination in Mountain Lake arising from the construction, operation, and maintenance of Park Presidio Boulevard, and CalTrans' failure to repair that damage; and also asserts that given CalTrans' refusal to conduct work required under the Agreement, the Secretary of Defense is authorized under ¶ 20 of the Agreement to arrange to have the remediation/ repair work done at CalTrans' expense

In the second cause of action, the United States alleges violation of ¶ 12 and ¶ 15 of the Agreement, based on CalTrans' failure to make changes in the topography of the United States' land in order to remedy the impairment of that land by Park Presidio Boulevard, and failure to conduct remedial action and construct drainage facilities, as

requested by authorized representative of Secretary of Defense.

In the third cause of action, the United States alleges violation of ¶ 18 of the Agreement, based on CalTrans' failure to indemnify the Army for claims asserted against it by the Presidio Trust, arising out of CalTrans' construction, maintenance, or operation of Park Presidio Boulevard.

In the fourth cause of action, the United States alleges violation of ¶ 9 of the Agreement, based on CalTrans' failure to operate and maintain Park Presidio Boulevard without expense to the Department of Defense.

In the fifth cause of action, the United States alleges violation of ¶ 12 and ¶ 15 of the Agreement, based on CalTrans' failure to operate and maintain the overflow pipeline system; and also asserts that given CalTrans' refusal to conduct operation/maintenance work required under the Agreement, the Secretary of Defense is authorized under ¶ 20 of the Agreement to arrange to have the work done at CalTrans' expense.

Now before the court are the parties' cross-motions for summary judgment. The United States seeks partial summary judgment as to certain issues relating to liability under the 1938 Permit, and CalTrans seeks summary judgment as to all causes of action pled in the complaint, or, in the alternative, partial summary judgment.

**DISCUSSION**

A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). In addition, the court can grant interlocutory summary judgment on liability alone, even if there is a genuine issue as to the amount of damages. See Fed. R. Civ. P. 56(d)(2).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome

1   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

2   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

3   verdict for the nonmoving party.  Id.

4          Where the moving party will have the burden of proof at trial, it must affirmatively

5   demonstrate that no reasonable trier of fact could find other than for the moving party.

6   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 994 (9th Cir. 2007).  On an issue where

7   the nonmoving party will bear the burden of proof at trial, the moving party can prevail

8   merely by pointing out to the district court that there is an absence of evidence to support

9   the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its

10  initial burden, the opposing party must then set forth specific facts showing that there is

11  some genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P. 56(e);

12  Anderson, 477 U.S. at 250.

13  B.     The United States' Motion

14         The United States seeks partial summary judgment that, pursuant to the 1938

15  Permit, (1) CalTrans is liable for all damage caused to Mountain Lake by discharges of

16  lead, copper, and zinc in run-off from Park Presidio Boulevard; (2) CalTrans is liable for its

17  share of past and future costs of remediation incurred or to be incurred by the United

18  States in responding to the contamination in Mountain Lake; and (3) CalTrans is liable for

19  repair or replacement of the deteriorated overflow pipeline that currently drains Mountain

20  Lake, as well as ongoing costs to repair and maintain the pipeline, including costs already

21  incurred by the United States in investigating and evaluating solutions for repairing the

22  pipeline.

23         The United States makes two main arguments in support of its motion – that the

24  1938 Permit is a valid contract under which CalTrans is liable for contamination of Mountain

25  Lake caused by runoff from Park Presidio Boulevard, and for costs the United States will

26  incur as a result of that contamination; and that the United States may, under the 1938

27  Permit, repair or replace the overflow pipeline and CalTrans' expense, and that CalTrans is

28  liable for the ongoing costs of operating and maintaining the overflow pipeline.

14

United States District Court

For the Northern District of California

1    The parties agree that roadway runoff that discharges into Mountain Lake from Park

2 Presidio Boulevard's storm drains contain lead, copper, and zinc.  In its first main

3 argument, the United States asserts that there is no dispute that the lead, copper, and zinc

4 discharged from Park Presidio Boulevard have contaminated and therefore damaged

5 Mountain Lake.  The United States contends that under ¶ 9 and ¶ 12 of the 1938 Permit,

6 CalTrans is liable for all such damage caused to Mountain Lake, and is obligated to

7 promptly repair such damage, to the satisfaction of the United States; and that under ¶ 20,

8 the United States is authorized to remediate the damage caused by the runoff, at CalTrans'

9 expense.

10    The United States also argues that under ¶ 18, which immunizes the United States

11 from damages caused by construction, operation, and maintenance of the highway, and

12 requires CalTrans to hold the United States harmless from any such claims, the United

13 States is immunized from any claim by DTSC that contaminants in the sediment in

14 Mountain Lake represent a hazard to human health and the environment.

15    In its second main argument, the United States contends that it may, under the 1938

16 Agreement, repair/replace the overflow pipeline at CalTrans' expense, and that CalTrans is

17 liable for ongoing costs of operating/maintaining the overflow pipeline.  The parties do not

18 dispute that the State originally built the overflow pipeline under the terms of the 1938

19 Permit, and then subsequently modified the pipeline at its own expense and at the direction

20 of the United States; and that the overflow pipeline is degraded and in need of repair or

21 replacement.  The United States argues that CalTrans is liable under the ¶ 15 and ¶ 20 of

22 the 1938 Permit for the repair or replacement of the overflow pipeline, and is liable under ¶¶

23 15 and 9 for ongoing operation and maintenance costs of the pipeline.

24    In opposition, CalTrans argues that lead, copper, and zinc discharged from Park

25 Presidio Boulevard have not "contaminated" or damaged Mountain Lake, and CalTrans is

26 therefore not liable under ¶¶ 9, 12, 18, or 20 of the 1938 Permit; and that it CalTrans is not

27 liable for repair or replacement of the overflow pipeline, or for ongoing operation and

28 maintenance costs.

United States District Court

For the Northern District of California

1    With regard to issues (1) and (2), CalTrans asserts that it is not liable under ¶ 12 of

2   the Agreement.  CalTrans claims that the substances in the runoff cannot be considered

3   "damage" or "contamination" because at the time the parties entered into the 1938 Permit,

4   they intended the runoff from Park Presidio Boulevard to be directed into Mountain Lake –

5   as evidenced by the fact that the United States approved the plans submitted by the State

6   for the drainage system that directs the runoff from the highway into the lake, and the fact

7   that CalTrans operated Park Presidio Boulevard for more than 70 years without objection

8   from the United States about draining into Mountain Lake.

9    CalTrans argues that to prevail on summary judgment, the United States must

10   establish that the 1938 Permit clearly indicates that "damage" includes the presence of

11   lead, copper, and zinc in the lake sediment resulting from runoff from the road.  CalTrans

12   asserts that the United States has failed to do this, and that the opinions of various

13   governmental agencies (including California's DTSC) regarding whether lead, copper, and

14   zinc in the sediment of Mountain Lake pose any hazard to human health and the

15   environment shed no light and have no bearing on what the parties to the 1938 Permit

16   intended the term "damage" to mean.

17    Moreover, CalTrans argues, the mere fact that a substance has been designated

18   "hazardous" does not necessarily mean that the presence of any amount of such substance

19   necessarily constitutes "damage."  In addition, CalTrans argues, DTSC has made no

20   finding regarding the necessary or appropriate remedial action, and has adopted no

21   standard for determining whether the lake sediment has been "damaged."

22    CalTrans contends further that it is not liable under ¶ 9 of the Agreement for such

23   "damage," because ¶ 9 requires that Park Presidio Boulevard be constructed, maintained,

24   and operated without expense to the War Department, but not to the United States as a

25   whole, while other provisions of the 1938 Permit do provide protections to the United States

26   as a whole.  In addition, CalTrans also argues that the United States admits that the Army

27   has incurred no costs, and contends that the fact that the Presidio Trust has incurred costs

28   does not mean that the Army or Department of Defense has incurred costs, or that those

United States District Court

For the Northern District of California

1    costs resulted from the presence of the lead, copper and zinc in the sediment.

2         With regard to ¶ 20, CalTrans asserts that it cannot be liable for costs the United

3    States has incurred due to CalTrans' alleged failure to remediate, for several reasons. First,

4    CalTrans contends that most of those costs were incurred well before the United States

5    notified CalTrans about its concerns or requested that CalTrans take action.  CalTrans

6    contends that ¶ 20 entitles the Secretary of War or his authorized representative to take

7    action only in the event that the State fails, neglects, or refuses to do so.  Thus, CalTrans

8    asserts, costs incurred in 2000 could not have followed demands for work made in 2007

9    and 2008.

10        Second, CalTrans claims that it has never refused to perform the work – and that it

11   is undisputed that the parties have participated in negotiation sessions including an

12   exchange of offers and demands regarding the United States' claims, and that CalTrans did

13   not respond to those claims by rejecting them, but by explaining that an extensive

14   exchange of information will be required before the claims can be fully analyzed and either

15   accepted or rejected.

16        CalTrans asserts further that any claim for costs the United States has not yet

17   incurred would be entirely speculative, and therefore unripe; and that any costs incurred by

18   the Presidio Trust arise from its consent agreement with DTSC, an agreement the Trust

19   chose to enter into and which it can terminate at any time.  Thus, CalTrans argues, any

20   costs incurred by the United States do not arise from the State's alleged refusal to perform

21   obligations under the 1938 Permit, but rather from the Trust's decision to enter into the

22   agreement with DTSC.

23        With regard to ¶ 18, CalTrans argues that a fair reading of that paragraph, taken

24   together with ¶ 12, is that it was intended to protect the United States from certain claims

25   made by other parties whose property was injured by the construction, operation, or

26   maintenance of Park Presidio Boulevard – not to provide indemnity from claims made by

27   the United States itself.  Thus, CalTrans argues, any claim by the Presidio Trust against the

28   Army pursuant to the MOA is not a claim for which CalTrans must indemnify the Army, as

17

**United States District Court**
For the Northern District of California

1   that this is not the type of "claim" covered by ¶ 18.

2          CalTrans contends that the 2001 and 2002 letters from DTSC do not constitute a

3   "claim" on the United States – but rather simply represent an expression of DTSC's

4   concern that the lake sediments were contaminated.  In the absence of an actual "claim,"

5   CalTrans argues, ¶ 18 does not apply.  Moreover, CalTrans argues, it could have breached

6   ¶ 18 only if it had failed to perform a duty imposed on it under that paragraph, but the

7   United States has never requested that CalTrans indemnify or save it harmless from any

8   "claim" made by DTSC or anyone.

9          With regard to issue (3), CalTrans contends that it is not liable for repair or

10   replacement of the overflow pipeline, or for ongoing operation and maintenance costs.

11   CalTrans argues that claims regarding the overflow pipeline are not ripe, as it has never

12   refused to repair the pipeline.  CalTrans notes that ¶ 15 requires the State to construct

13   culverts or drainage facilities as "in the opinion of the Secretary of War or his authorized

14   representative (or their successors), shall be or become necessary."  CalTrans argues,

15   however, that the United States has made no showing that any other individual has ever

16   been designated as the "authorized representative" of the Secretary of War, and has

17   provided no evidence that either the Secretary of War or his authorized representative ever

18   determined that specific "culverts or drainage facilities" are necessary.

19          CalTrans asserts further that there can be no breach under ¶ 20 of the 1938 Permit,

20   as it has never refused to repair or replace the overflow pipeline.  CalTrans also claims that

21   it is not possible to show any such refusal, given that most of the costs alleged to have

22   been incurred by the United States occurred prior to any demand having been made on

23   CalTrans by the United States.

24          The court finds that the 1938 Permit is a valid enforceable agreement that remains

25   binding on the parties.  Where, as here, the United States enters into a contract pursuant to

26   authority conferred by federal statute, federal law controls, U.S. v. Seckinger, 397 U.S. 203,

27   209-10 (1970), with guidance provided by general principles for interpreting contracts.  See

28   Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999).

United States District Court

For the Northern District of California

1   The 1938 Permit "must therefore be read as a whole and every part interpreted with

2   reference to the whole, with preference being given to reasonable interpretations."  Id.  The

3   terms of the Agreement should be given their ordinary meaning, and to the extent possible,

4   the intent of the parties should be determined from the plain language of the agreement

5   itself.  Id.  In determining whether a contract is ambiguous, the question is not whether the

6   parties dispute its meaning, but whether "reasonable people could find its terms susceptible

7   to more than one interpretation."  Id.

8       The 1938 Permit includes numerous provisions requiring that the State bear all costs

9   and liabilities associated with the construction, operation, and maintenance of Park Presidio

10  Boulevard.  Reviewing these provisions in light of the principles of contract interpretation

11  set forth above, see Klamath, 204 F.3d at 1210, the court finds that the intent of the parties

12  in entering into the 1938 Permit was to grant the State of California permission to access

13  and make use of a portion of the Presidio for purposes of constructing its roadway, and in

14  return, to provide the United States with a series of protections designed to ensure that the

15  State's ongoing use of the property would not cause damage to the Presidio, and would not

16  cost the United States money.

17      The court finds that the motion must be GRANTED as to issues (1) and (2) (with one

18  exception set forth below).  The evidence shows that discharges of lead, copper, and zinc

19  in the runoff from Park Presidio Boulevard has caused "damage" to Mountain Lake.  The

20  sampling by the Presidio Trust, along with the testimony of experts for both CalTrans and

21  the United States, establish that substances in the runoff from Park Presidio Boulevard

22  have substantially contaminated Mountain Lake.  In addition, DTSC (an agency of the State

23  of California) has deemed Mountain Lake a hazard to human health and the environment,

24  because of the presence of lead, copper, zinc, and other contaminants in the lake

25  sediment.  In 2001 and 2002, DTSC identified the highest lead levels as being in the area

26  adjacent to the highway storm drains.

27      By any ordinary definition, such contamination constitutes "damage caused to the

28  property of the United States incident to the operation or maintenance" of Park Presidio

United States District Court

For the Northern District of California

1   Boulevard, as provided in ¶ 12 of the 1938 Permit.  As shown further by the declarations

2   filed in support of the United States' motion, the damages incurred by the United States

3   include costs relating to Mountain Lake and the overflow pipeline.

4          Further, there is no indication in the 1938 Permit that the parties intended for the

5   contamination of Mountain Lake to be excluded from the definition of "damage."

6   Notwithstanding the fact that the Agreement does not specifically mention damage from

7   highway runoff, it is clear from its face that the parties' intent was to protect the United

8   States from any harm caused by the "construction, operation or maintenance" of the State's

9   highway.

10          It is also undisputed that CalTrans has failed to repair damage to the Presidio.

11   CalTrans claims that the negotiations are on-going, and suggests that it cannot be said to

12   have "refused" to repair the damage until it actually says so in as many words.  However,

13   the fact remains that CalTrans has not settled on terms agreeable to the United States, and

14   that the United States is thus entitled under ¶ 20 to pursue the present action.

15          Further, the court finds CalTrans' claim that there is no evidence that the "authorized

16   representative" referenced in the 1938 Permit made any of the determinations or decisions

17   required under the Agreement, or made any demands or requests on CalTrans, to be

18   without merit.

19          As set forth in detail in the "Background" section, above, under the National Security

20   Act of 1947, the Department of War was designated the Department of the Army (later

21   designated the Department of Defense, of which the Department of the Army is a part).

22   The National Security Act of 1947 provided that "[a]ll . . . actions relating to the Department

23   of War or to any officer or activity" whose title was changed by the 1947 Act "be deemed to

24   relate to the Department of the Army . . or to such officer or activity designated by his or its

25   new title," and that all "functions" of such officer, departments, or agency "be deemed to

26   have vested" in the officer, department or agency "to which the transfer was made."

27          The Department of the Army transferred administrative jurisdiction over the Presidio

28   to the Department of the Interior in 1994, and the Department of the Interior in turn

United States District Court

For the Northern District of California

1    transferred administrative jurisdiction over Area B of the Presidio to the Presidio Trust in

2    1998.  Thus, the Presidio Trust is successor-in-interest to the Army and the Department of

3    Defense, which in turn is successor to the Department of War.  The evidence shows that

4    the authorized representatives of both the Army and the Presidio Trust made the

5    appropriate determinations and authorized the filing of the complaint in the present action.

6         Both the Army and the Trust determined that contaminants in the runoff from Park

7    Presidio Boulevard have settled in the sediment at the bottom of Mountain Lake, thereby

8    damaging the lake, and also determined that the overflow pipeline has deteriorated and

9    requires replacement or repair.  Both the Army and the Trust advised CalTrans of this

10   damage, and its liability under the 1938 Permit, and demanded that CalTrans take action to

11   remediate the damage to the lake and to effectuate the repairs to the overflow pipeline.

12        The Army sent CalTrans a claim letter on April 19, 2007 pursuant to the 1938

13   Permit, describing the contamination in Mountain Lake, and stating that the Trust had made

14   a claim against the Army for that contamination.  On April 18, 2008, the Army and the

15   Presidio Trust sent a second letter to CalTrans, stating that its highway was damaging

16   Mountain Lake, and also identifying the claim relating to the overflow pipeline, and

17   demanding that CalTrans comply with the terms of the 1938 Permit.

18        In addition, immediately before the complaint was filed, both the Army's authorized

19   representative – the DASA(ESOH), with approval of the Secretary of the Army – and the

20   Presidio Trust's authorized representative – the Trust's General Counsel, with the approval

21   of the Trust's Executive Director – determined that the State of California's construction,

22   operation, and maintenance of Park Presidio Boulevard had impaired and damaged

23   Mountain Lake, and that the overflow pipeline was in need of repair or replacement.

24        The court finds that, pursuant to ¶¶ 9, 12, and 20 of the 1938 Permit, CalTrans is

25   liable for damage caused to Mountain Lake by discharges of lead, copper, and zinc, in

26   runoff from Park Presidio Boulevard; and that, having failed to repair or remediate such

27   damage, CalTrans is liable for its share of past and future costs of remediation incurred or

28   to be incurred by the United States in responding to the contamination of Mountain Lake,

including costs of investigation.

With regard to the claim under ¶ 18, the court agrees with the United States that it is immunized from any claim by DTSC relating to the contamination in Mountain Lake. However, to the extent that the United States is seeking indemnification for the claim by the Presidio Trust against the Army, as reflected in the September 6, 2006 demand letter (and as alleged in the complaint), such a claim amounts to a claim by one department of the United States against another department of the United States, and summary judgment as to that portion of the claim will be DENIED; whereas ¶ 18 appears to provide for indemnification by CalTrans for any claim against the United States by a third party.  In any event, however, it also appears that such a claim under ¶ 18 may be unnecessary in light of ¶ 12.

Summary judgment is also GRANTED as to issue (3).  Pursuant to ¶ 15 of the 1938 Permit, CalTrans is required to "construct such culverts or other drainage facilities, as, in the opinion of the Secretary of War, or his authorized representative, shall be or become necessary to the proper use of the reservation by reason of the construction of such road." The United States having determined that the present overflow pipeline is damaged and requires replacement (or repair), CalTrans is liable pursuant to ¶ 20 of the Agreement for the costs of such replacement (or repair).

C.    CalTrans' Motion

CalTrans seeks summary judgment as to all five causes of action alleged in the complaint, or, in the alternative, partial summary judgment.  CalTrans' arguments in this motion closely track the arguments in its opposition to the United States' motion.

With regard to the first cause of action for failure to repair damage caused incident to the construction, operation, or maintenance of Park Presidio Boulevard, in violation of ¶ 12 of the 1938 Permit, CalTrans argues that summary judgment should be granted because Mountain Lake has not been damaged within the meaning of the Agreement, and CalTrans has no duty to repair it.

CalTrans contends that runoff from the road and drainage facilities cannot constitute

United States District Court

For the Northern District of California

"damage" under the Agreement because the State's construction plans and drawings were reviewed and approved by the United States at the time of construction.  CalTrans argues that the United States' interpretation of "damage" is unreasonable, as a reasonable person would not contract for the right to construct and operate a road, including draining runoff into an adjacent lake, and yet also leave itself at perpetual risk of breaching the contract for the obvious and natural consequences associated with operating the road in that manner.  CalTrans asserts that a more reasonable interpretation of "damage" would be injury resulting from unintended consequences of constructing and operating the road, such as major accidents or unexpected engineering problems.

CalTrans claims that the parties' "course of performance," after the construction and approval of the road and the drainage facilities, also shows that the parties did not intend that the contamination of Mountain Lake with lead and other substances be considered "damage" under the Agreement.  CalTrans asserts that for more than 60 years, the State operated Park Presidio Boulevard without complaint from the United States about drainage into the lake, despite the fact that the Army had tested the sediment in the lake in the 1990s and discovered the presence of lead and other substances, which the Army attributed to Park Presidio Boulevard.

CalTrans also argues that the United States does not have discretion under the Agreement to determine whether its property has been "damaged."  CalTrans claims that the Agreement does not say that the State must repair the United States' property when, in the opinion of the authorized representative, it has been damaged, although it does grant some discretion to the authorized representative when the property is actually damaged to determine whether the repair is satisfactory.  CalTrans asserts that interpreting the Agreement to give the United States discretion to determine whether its property has been damaged by Park Presidio Boulevard would be "nonsensical," because there would be virtually no limit or restriction to the imposition of liability and expense on CalTrans."

Moreover, CalTrans contends, not only has the fact of damage not been determined, but it has never refused to repair damage.  CalTrans claims it has met with the United

United States District Court
For the Northern District of California

1   States to discuss the Army's claims of liability, and has communicated that it remains

2   committed to continuing that dialogue.  CalTrans asserts, however, that to date, the United

3   States has not provided any data or information indicating the exact amounts of lead or

4   other substances that are attributable to Park Presidio Boulevard, as opposed to other

5   sources.  CalTrans argues that before its duty to repair damage to Mountain Lake can be

6   triggered, the nature and extent of the damage must first be determined.

7         With regard to the second cause of action for failure to conduct remedial action and

8   construct drainage facilities, in violation of ¶¶ 12 and 15 of the 1938 Permit, CalTrans

9   contends that summary judgment should be granted because it has no duty to make

10  changes to the topography of Mountain Lake or to modify drainage facilities from Park

11  Presidio Boulevard, in the absence of an appropriate determination by the Secretary of

12  War's "authorized representative."

13        CalTrans claims that the United States has offered vague, inconsistent, and

14  unsupported theories about who the authorized representative was under the 1938 Permit,

15  how the authorized representative has changed over time, and how the United States'

16  obligations under the 1938 Permit have been bifurcated between the Army and the Presidio

17  Trust.  Indeed, CalTrans asserts, it is not even clear that the 1938 Permit was ever

18  assigned or transferred from the Army following the closure of the base in 1994, or that the

19  Agreement was transferred or assigned from the Park Service to the Presidio Trust.

20        Moreover, CalTrans contends, the requests and demands made by the United

21  States in the 2007 and 2008 letters did not trigger a duty to perform, because nowhere in

22  those letters did the United States actually request that CalTrans make "changes to the

23  topography of Mountain Lake," or construct or modify drainage facilities from Park Presidio

24  Boulevard.  CalTrans asserts that all the United States asked was that CalTrans "accept

25  responsibility for any contamination" caused to the lake as a result of the construction,

26  operation, or maintenance of Park Presidio Boulevard, and that the United States explained

27  that it would be seeking adequate cleanup of the lake as well as reimbursement for

28  remediation costs and injunctive relief to ensure no further contamination.  However,

24

United States District Court

For the Northern District of California

1  CalTrans argues, such requests cannot be considered a demand that CalTrans comply

2  with specific provisions of the Agreement.

3       In addition, CalTrans reiterates that it has never "refused" to perform the work

4  allegedly requested.  Again, CalTrans argues that it has met with the United States on

5  numerous occasions to discuss offers and demands regarding the United States' claims,

6  but that it has never obtained a clear answer from the United States as to what specific

7  tasks it believes need to be accomplished to remediate the contamination.

8       With regard to the third cause of action for failure to indemnify the Army for claims

9  arising from the construction, operation, and maintenance of Park Presidio Boulevard, in

10  violation of ¶ 18 of the 1938 Permit, CalTrans argues that summary judgment should be

11  granted because it has no duty to indemnify the Army from the claim made by the Presidio

12  Trust.

13       CalTrans contends that the claim by the Trust against the Army is not within the

14  scope of ¶ 18, because the intent of ¶ 18 was for the State to indemnify the United States

15  against claims made by third parties resulting from damage or injury on the road or arising

16  incident to the construction, operation, or maintenance of the road.  According to CalTrans,

17  the claim for which the United States seeks indemnification here is "a claim by itself, which

18  it created."  CalTrans contends that but for the Army's decision to execute the MOA, the

19  claim would not exist, and that this claim is simply an assertion by the Trust that the Army

20  has certain duties under the MOA.

21       With regard to the fourth cause of action for failure to maintain Park Presidio

22  Boulevard without expense to Department of Defense, in violation of ¶ 9 of the 1938 Permit,

23  CalTrans argues that summary judgment should be granted because its construction,

24  operation, and maintenance of Park Presidio Boulevard have not caused expense to the

25  Army within the meaning of the Agreement.  CalTrans reiterates that all costs incurred to

26  date have been incurred by the Trust, not by the Army.  CalTrans contends that there is no

27  allegation in the complaint that the Trust is the successor in interest to the Army, and that

28  the Agreement is clear in ¶ 9 that there shall be no expense to "the War Department" – not

25

United States District Court
For the Northern District of California

1   to the United States as a whole.

2        CalTrans also argues that the United States has misconstrued the intent and scope

3   of ¶ 9, and that a reasonable interpretation would be that the United States has no

4   obligation to pay to construct, operate, or maintain the road.  CalTrans asserts that ¶ 9

5   does not include what it terms "elective expenses," and argues that any expenses the

6   United States incurred here would be "elective" since it agreed to the drainage system that

7   allowed the runoff to enter the lake.

8        With regard to the fifth cause of action for failure to repair, replace, or modify the

9   Mountain Lake overflow pipeline system, in violation of ¶¶ 12 and 15 of the 1938 Permit,

10  CalTrans argues that summary judgment should be granted because it has no duty under

11  the Agreement to repair, replace, or modify the overflow pipeline.  Again, CalTrans asserts

12  that the "authorized representative" never made the determinations or requests alleged in

13  the complaint; that CalTrans has never "refused" to perform the work; and that the United

14  States has misinterpreted the 1938 Permit and has interpreted it too broadly.

15       According to CalTrans, the United States is improperly interpreting ¶ 15 as giving it

16  broad authority to direct CalTrans "to construct drainage facilities over and over again with

17  no limitation."  CalTrans claims that under this interpretation, the United States could order

18  CalTrans to construct new drainage facilities next month, and then order it the following

19  month to construct still newer facilities, and the month after that, to construct still newer

20  facilities.  Moreover, CalTrans argues, while the Agreement required the State to construct

21  the drainage facilities, it does not require the State to maintain those facilities.

22       In opposition, the United States argues that summary judgment should be denied as

23  to the first cause of action because the evidence shows that CalTrans has caused

24  "damage" to the Presidio within the meaning of ¶ 12 of the 1938 Permit, and is liable for

25  that damage.  The United States contends that under any reasonable interpretation of the

26  1938 Permit, the contamination of Mountain Lake constitutes "damage" caused to property

27  of the United States.  The United States asserts that the question is whether any

28  reasonable person would believe that his property had been damaged upon discovering

United States District Court

For the Northern District of California

1    that it had been contaminated with hazardous substances in quantities sufficient for a state

2    hazardous control regulator to find that the contamination represents a hazard to human

3    health and the environment.

4         As for CalTrans' argument that the injury to Mountain Lake caused by the runoff

5    from Park Presidio Boulevard was "intended" by the parties, the United States responds

6    that CalTrans' artificial distinction between "intended" and "unintended" damage is not

7    consistent with the language of the 1938 Permit, which makes no mention of "intended" vs.

8    "unintended" damage.  Moreover, the United States argues, the entire Agreement is

9    consistent in indicating that the United States is to be spared any expense for any damage

10   connected to the construction or operation of Park Presidio Boulevard.

11        With regard to CalTrans' "course of performance" argument, the United States

12   argues that the fact that it did not complain to CalTrans about discharges into Mountain

13   Lake until after the Presidio Trust assumed jurisdiction over Area B of the Presidio is of no

14   account, as it did not learn until 2001, following receipt of results of testing requested by

15   DTSC, that Mountain Lake sediments were contaminated with significant levels of lead,

16   copper, zinc, and other substances.  The United States notes that CalTrans was promptly

17   notified of the results of the adverse test results by DTSC, and that it was only after

18   ongoing discussions and negotiations with CalTrans that the United States issued the

19   formal demand letters in 2007 and 2008.

20        The United States also asserts that the 1938 Permit gives it discretion to determine

21   when its property has been "damaged."  The United States agrees that ¶ 12 does not use

22   the word "discretion," but asserts that the paragraph must be taken as a whole, within the

23   context of the entire Agreement.  The United States contends that ¶ 12 repeatedly

24   references the notion that the Secretary of War or his authorized representative has sole

25   discretion to determine both when impairment to United States property has occurred, and

26   what measures are necessary to remediate that impairment.

27        The United States argues further that CalTrans has failed to repair damage it caused

28   to Presidio property.  The United States asserts that while it may be true that the parties

1   have engaged in settlement discussions regarding the United States' demands, CalTrans

2   has never agreed to the United States' settlement demands, and has not commenced to

3   conduct any repair of the damage caused by its roadway as the United States has

4   demanded.

5          The United States argues that summary judgment should be denied as to the

6   second cause of action, because under ¶ 12 of the 1938 Permit, CalTrans has a duty to

7   change the topography of the land by removing contaminated sediment from Mountain

8   Lake and redirecting storm drains to avoid further injury to Mountain Lake.

9          With regard to CalTrans' claim that the "authorized representative" of the Secretary

10  of War did not make the appropriate determinations or demands, as required under the

11  Agreement, the United States reiterates that DASA(ESOH) is the Army's "authorized

12  representative" under the 1938 Permit, and that the Presidio Trust, as successor-in-interest

13  to the Department of War under the 1938 Permit, is also authorized to make determinations

14  under ¶¶ 12 and 15.  The United States contends that the Army and the Presidio Trust

15  determined that Mountain Lake contamination resulting from CalTrans' operation of the

16  highway requires remediation, and that CalTrans must redirect storm drains to avoid further

17  contamination.

18         The United States notes that CalTrans itself previously acknowledged that the Trust

19  is the predecessor-in-interest to the United States War Department, and that the transfer of

20  interest, as well as the reservation of rights by the Army, are established by the various

21  transfer documents produced in this litigation.  The United States contends that, as

22  successor-in-interest to the Army with regard to the 1938 Permit, the Trust must be able to

23  make the same determination that under the express terms of the Agreement are assigned

24  to the Secretary of War and his authorized representative.  Were it otherwise, the United

25  States argues, all other protections granted to the United States via the Agreement would

26  simply have evaporated when the United States eliminated the position of "Secretary of

27  War," or when the Presidio Trust assumed the Army's authority over the Presidio.

28         In addition, with regard to CalTrans' assertion that the United States' demands on

United States District Court

For the Northern District of California

CalTrans were overly vague or that this claim is unripe or "premature," the United States concedes that the final planning for the dredging of Mountain Lake will require the completion of necessary environmental documents, conditioned on approval of DTSC, and also concedes that a final plan for re-routing drainage from Park Presidio Boulevard has not yet been established and will in any event require approval from various California agencies.

However, the United States argues, it does not follow that CalTrans' failure to accept responsibility for this work is not a breach of the Agreement. The United States notes that CalTrans has not agreed to pay for any portion of the planning costs with regard to either project, which continue to mount, and has not agreed to pay for any portion of the costs once the plans are finalized. Thus, the United States contends, this action was not premature and the demands are not overly vague.

The United States argues that summary judgment should be denied as to the third cause of action because CalTrans' duty to indemnify the United States under ¶ 18 of the 1938 Permit was triggered by the Presidio Trust's claim against the Army, as well as by DTSC's claim against the Presidio Trust. The United States contends that CalTrans' argument that the Presidio Trust's claim is against the Army, not against CalTrans, mistakes the underlying basis of the Trust's claim – which is essentially that, under the MOA, the Army is liable for the contamination of Mountain Lake arising from CalTrans' construction, maintenance, and operation of Park Presidio Boulevard. It is for this reason, the United States asserts, that it seeks a declaratory judgment that CalTrans shall be liable to the extent that the Army must pay the Trust's claim for damage caused to the Presidio by CalTrans' highway.

The United States argues that summary judgment should be denied as to the fourth cause of action because, notwithstanding that the Army retains rights under the 1938 Permit, the Presidio Trust is also the successor-in-interest to the Army and the Department of Defense (successor to the War Department) with regard to Area B of the Presidio. Thus, the United States argues, the "construction, operation and maintenance" of Park Presidio

United States District Court

For the Northern District of California

1   Boulevard have caused "expense" to both the Army and the Presidio Trust, in violation of

2   ¶ 9 of the Agreement.

3        As for CalTrans' assertion that the United States is improperly attempting to recover

4   for "elective" expenses under ¶ 9, the United States responds that its expenses in

5   investigating and planning for the remediation of Mountain Lake have been incurred (and

6   will be incurred) as a direct result of DTSC's express concern regarding the Mountain Lake

7   sediment contamination, which in turn triggered the United States' obligations under the

8   1999 Consent Agreement.  Thus, the United States argues, to the extent that the

9   Agreement supports any distinction between "elective" and "non-elective" expenses, the

10  expenses related to the investigation and remediation of the Mountain Lake contamination

11  cannot be dismissed as "elective."

12       Finally, the United States argues that summary judgment should be denied as to the

13  fifth cause of action because CalTrans is liable for repair, replacement, and maintenance of

14  the Mountain Lake overflow pipeline.  The United States contends that the Presidio Trust

15  made the demand on CalTrans in the April 18, 2008 letter, which was also issued in the

16  name of the Army, and asserts that this letter was sufficient to trigger CalTrans' duty under

17  the 1938 Permit.  The United States argues that any reasonable reading of ¶ 15 of the

18  Agreement will establish that the State was not only required to construct the pipeline, but

19  also to maintain it.

20       The court finds that CalTrans' motion must be DENIED as to the first, second, fourth

21  and fifth causes of action, and GRANTED in part and DENIED in part as to the third cause

22  of action.  With regard to the first cause of action, the United States has provided sufficient

23  evidence to support a finding that Mountain Lake has been damaged by the runoff from

24  Park Presidio Boulevard.  While it is true that the precise level of contamination in the

25  sediment has not yet been determined, and that it is not yet clear whether sources other

26  than the runoff have contributed to the contamination, the United States has agreed that

27  these are issues that remain for trial.

28       The 1938 Permit does not support CalTrans' position that because the United States

United States District Court

For the Northern District of California

1   and the State of California agreed to construct the drainage system at the time Park

2   Presidio was constructed, the "obvious and natural consequences" of that agreement were

3   that lead and other pollutants would be entering Mountain Lake, and that CalTrans

4   therefore has no duty to repair such damage.  The Agreement plainly provides that

5   CalTrans bears full responsibility for "any damage caused to property of the United States

6   incident to the . . . operation or maintenance of" the roadway.

7          The court finds further that the Agreement – in particular ¶ 12 – vests the United

8   States with discretion to make determinations regarding whether damage has occurred to

9   its property.  For example, the second sentence of ¶ 12 provides that "[i]f, in the opinion of

10  the Secretary of War or his authorized representative," any construction authorized under

11  the Agreement "shall now or hereafter tend to affect or impair the use of land or other

12  property of the United States," the State "shall . . . make any change or changes in the

13  topography of the land," and "the Secretary of War or his authorized representative shall be

14  the sole judge as to the character and extent of such work that may be necessary."

15         This sentence, taken together with the last sentence of ¶ 12 – "And generally, any

16  damage caused to property of the United States incident to the construction, operation or

17  maintenance of said road shall be promptly repaired" by the State at its expense – along

18  with the provision in ¶ 21 that the directions of the Secretary of War or his authorized

19  representative "concerning matters in the permit shall be strictly and promptly carried out by

20  the permittee," and that his decision in all matters relating to the permit "shall, unless

21  otherwise provided herein, be final," establishes that the United States has discretion under

22  the Agreement to determine whether its property has been damaged and how that damage

23  should be rectified, and that the directions of the United States regarding the need to repair

24  or remediate such damage must be carried out by the State.

25         The motion for summary judgment as to the second cause of action is denied.  It is

26  undisputed that the U.S. Army is the successor to the Department of War; that the Army

27  transferred to the Department of the Interior "all jurisdiction and control of the real property,

28  interests, rights, leases, easements, and appurtenances at the Presidio of San Francisco"

1   for incorporation into the GGNRA (while retaining certain responsibilities for remediation of

2   environmental contamination); and that the Department of the Interior transferred

3   administrative jurisdiction over Area B of the Presidio to the Presidio Trust.

4       It is also undisputed that the authorized representatives of both the Army and the

5   Trust have determined that CalTrans is obligated to remediate the contamination in

6   Mountain Lake, and that the Army and the Trust demanded in the April 18, 2008 letter that

7   CalTrans "remedy or pay for remediation of this damage caused to Mountain Lake by the

8   construction, operation and maintenance of Park Presidio Boulevard, [and] take measures

9   necessary to avoid further damage to Mountain Lake."

10      The motion for summary judgment as to the third cause of action is denied to the

11  extent that the United States claims that CalTrans' duty to indemnify the United States

12  under ¶ 18 of the 1938 Agreement may have been triggered by DTSC's claim against the

13  Presidio Trust.  However, as explained above in the discussion of the United States' motion

14  for partial summary judgment, the court is not persuaded that ¶ 18 provides a basis for a

15  claim of indemnification based on the Presidio Trust's claim against the Army (as alleged in

16  the complaint), and finds that CalTrans' motion must be granted on that limited basis.

17      The motion for summary judgment as to the fourth cause of action is denied,

18  because the evidence shows that CalTrans has failed to operate and maintain Park

19  Presidio Boulevard without expense to the Army and the Presidio Trust, which are, as

20  explained above, the successors to the War Department for purposes of the 1938 Permit.

21      The motion for summary judgment as to the fifth cause of action is denied.  It is

22  undisputed that the original overflow pipeline was installed by the State, pursuant to the

23  1938 Permit, at the time of the construction of Park Presidio Boulevard, and that the

24  pipeline was modified and extended, again at the expense of the State, in 1941, at the

25  request of the Army.  CalTrans is obligated under ¶ 12 of the Agreement to "promptly

26  repair[ ]" any damage to the property of the United States "incident to the construction,

27  operation or maintenance" of Park Presidio Boulevard; and is obligated under ¶ 15 of the

28  Agreement to "construct such culverts or other drainage facilities" as, in the opinion of the

United States, "shall be or become necessary to the proper use of the reservation by reason of the construction of" Park Presidio Boulevard.

## CONCLUSION

In accordance with the foregoing, the court hereby GRANTS plaintiff United States of America's motion for partial summary judgment and DENIES defendant California Department of Transportation's motion for summary judgment, with the exception of the portion of the claim under ¶ 18 in which the United States alleges that CalTrans is under a duty to indemnify the Army from the claim made by the Presidio Trust.

All other issues remain for trial, which is scheduled to commence on May 2, 2011. The parties shall attend a mandatory settlement conference before trial, which is the subject of a separate order.

**IT IS SO ORDERED.**

Dated:  February 25, 2011

_____

PHYLLIS J. HAMILTON
United States District Judge